MANN, Chief Judge
(dissenting).
“A state may not rely in a criminal prosecution . . . on an identification secured by a process in which the search for truth is made secondary to the quest for a conviction.” [1]
Sometimes a singleminded law enforcement officer finds it difficult to keep the totality of circumstances in mind when showing photographs to witnesses. I would reverse Bryan’s conviction because one of Florida’s most experienced law enforcement officers conducted identification procedures in a prejudicial manner. I write at some length about the problems involved because of the frequency with which they are encountered, the possibility of convicting the innocent through misi-dentification, and the confused state in which we appellate judges have left the law. My hope is to bring clarity out of chaos. I am not at all confident of success.
This is an exceedingly close case, but for reasons which I shall attempt to explain herein, the errors relating to identification procedures might have been prejudicial. I agree with the majority that there is no question whatever that Bryan was physi *517 cally present with Durham on the night in question, but there is some evidence from the other witnesses that one of the two men was not aggressive and we have Bryan’s testimony that he was not implicated in the kidnapping beyond physical presence with Durham, and that at the earliest practicable moment asked to be taken home. Durham complied. My vote to reverse rests upon the belief that Bryan’s remaining with Durham until they left the scene of the abduction of Mrs. Brooks might have been believed by a jury of reasonable persons to have been a lawful act. The identification procedures in this case are material because their cumulative effect has been to heap upon Bryan alone the guilt of two men and the conduct of the trial judge is such as to forbid Bryan access to other evidence respecting crucial matters of identification. Thus, since I view the identification procedures and the trial judge’s action cumulatively to constitute a deprivation of due process, I cannot attest the conviction to be harmless beyond a reasonable doubt under the standard pronounced in Chapman v. California.[2]

The Crime

Richard Henry Bryan and John Henry Durham were in a party which left Conner’s Corner as it closed early one Sunday morning. They had been drinking, and Durham nearly hit another patron in the parking lot as he drove off. As the man protested, Durham drew his .22 caliber Derringer and Bryan his .25 caliber automatic, and that argument subsided. They proceeded to Van Winkle’s home, where all were staying that night, but Durham and Bryan had not drunk their fill. Hunting for beer after hours, they came upon Willie Brooks and his wife Theresa and C. C. Barker, who offered to help. While Barker was inside one of the places they went in search of beer, a third man, Fordoms, came out, at a bad time for him. Bryan and/or Durham were getting impatient. Either Bryan or Durham — each says the other — threatened to shoot Fordoms, who used whichever of Bryan or Durham was not the aggressor as a shield, and escaped. After the incident involving Fordoms, Barker emerged with the beer. Either Bryan or Durham took it in through the window and they drove off with Mr. and Mrs. Brooks in the car. After driving a short distance, Mr. Brooks was forced out of the car and Durham drove off, with Mrs. Brooks and Bryan in the car. Bryan’s story fills parentheses at this point: he says he had no part in the kidnapping and asked Durham to take him home, which he says Durham did. Durham and Mrs. Brooks, certainly, and Bryan, says Durham, then went to the phosphate pit near Dover, east of Tampa, in which Mrs. Brooks’ body was found. The ballistics expert identified the bullet found in her as a .22 caliber bullet, such as would be fired by a gun like Durham owned. Durham says he had the .22 stack-barrel Derringer until after he had had sexual intercourse with Mrs. Brooks and that it was in the car while she and Bryan remained there, that he heard Bryan make an unreasonable demand for sexual gratification, and Durham says he then heard a shot.

The Identification Procedures

We know little of the investigation by the City of Tampa police. They came promptly, and Brooks gave a description of the two men to two investigating officers. He said at trial that this description was accurate at the time. Bryan’s attorney moved for its production, but the trial judge denied his motion, and further refused to grant in camera inspection. The State declined to bring these officers as witnesses.
Detective Stamatakis was given a description, and testified at the trial. This description is fairly consistent with the admitted facts: Durham has dark hair, Bryan was blond. Nothing appears in this description about a scar on Durham’s cheek.
*518 We do not know everything about the procedures employed by the Sheriff’s office. We do know this: Pictures of Bryan and five other men were shown to witnesses on June 15, the day Bryan was taken in custody on another charge, but probably before he was in custody. Sheriff’s records do not accurately place the time. On June 17, pictures of Bryan and five men not shown in the first array were displayed at 8:45 a. m. Bryan was in custody. Neither his counsel nor substitute counsel was present. On the afternoon of June 17, Bryan appeared in a line-up with five men, none of whom was pictured in either batch of photographs. His counsel was present. No positive identification was made. At the close of the line-up, Bryan’s counsel went with him into an interrogation room. The deputies apparently interviewed the witnesses out of the presence of Bryan’s counsel, and apparently no objection was made. It does not appear clearly what procedure was followed at this point, although it is important. As the witnesses were leaving, accompanied by deputies but not by Bryan’s lawyer, Brooks told a deputy he thought Bryan was the man, but wasn’t sure because his hair was short. Bryan admits asking for a haircut, and the State is not entirely responsible for changing his appearance. But then, his appearance was significantly changed, and the State was clearly under no obligation to cut Bryan’s hair, and should not have done so. At any rate, the officer in charge had pictures of Bryan with longer hair, and a very negative remembrance of United States v. Wade,[3] so, thinking that he need not advise Bryan’s counsel of any removal of the identification procedure to a room upstairs because there was no corporeal lineup, he took the witnesses to his office upstairs, where photographs of Bryan and five other men were shown. It is thought, but the officer in charge is not certain, that these were the same photographs shown that morning. At the trial, this packet of photos included three of Bryan. The additional two were said to have been included later by an assistant State Attorney who was involved before trial. Counsel was not advised that Brooks had identified Bryan on this occasion. Even on taking of depositions, the answers of deputies were coy and vague, and only shortly before trial was it disclosed that an identification had taken place.
Additionally, none of the witnesses was shown Durham at any time. If they were allowed in his presence in the witness room, no mention is made of it. Durham’s presence could have been compelled under the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings,[4] but no effort was made to clarify the question, raised clearly by Fordoms’ deposition, which man was the aggressor and which the helpful shield. This important circumstance is the essence of Bryan’s theory of defense, that he left Durham before the murder. From the standpoint of its appeal to the jury, this was tactically sound. Durham was granted immunity, and belief in Bryan’s version might have led to a verdict of acquittal on the charges given the jury, which contained no mention of the theory on which the majority find his guilt proven beyond a reasonable doubt, namely, that he was an aider and abetter in a kidnapping which resulted in Mrs. Brooks’ death.

The Harmless Error Question

Our Supreme Court has held that where a defendant is clearly shown to be either a perpetrator or an aider and abetter, his conviction must be affirmed, absent other error, although the charge to the jury included no mention of the accused’s guilt as a principal under Fla.Stat. § 776.011, F.S. A. (1971) upon proof of aiding and *519 abetting.[5] If the proof were conclusive beyond a reasonable doubt that Bryan aided and abetted the kidnapping of Mrs. Brooks, I would think him guilty of felony murder. He would then be the beneficiary as was Roby of the State’s restraint. In both of these cases, the state did not seek conviction upon as broad a basis as it might. I agree with the theory of Roby. The Supreme Court’s opinion there embodies in essence my dissent in the case when it was in this court,[6] but if Bryan’s own testimony is credited, he is not necessarily an aider and abetter in the kidnapping.
In short, this is not a case in which the appellant’s guilt was shown beyond a reasonable doubt — the Chapman standard which Mr. Justice Hobson articulated years earlier in Cornelius v. State.[7]
The State chose not to attempt to prove its case by showing that Bryan was one of two men participating in a kidnapping during which Mrs. Brooks was murdered. The prosecution insisted upon piling the guilt of both men upon Bryan — possibly a tactical necessity in view of the grant of immunity to Durham. There are three significant details used by the prosecution to identify Bryan as the aggressor that do not square with Durham’s testimony. Durham admits that he had the stack-barrelled Derringer, and all of the witnesses are agreed that the aggressive man had such a gun. Durham admits that he was the driver of the car and that he gave Barker $6 to get beer. Brooks own deposition identified Bryan as the driver, and trial testimony-marks Bryan as the man who gave the $6 to Barker, and the possessor of the Derringer. Bryan is entitled to a fair hearing on his claim of non-involvement in the kidnapping. He was indisputably physically present. But he would have been indisputably foolish to have left the security of Durham’s car at three in the morning in a predominantly black neighborhood after a companion had abducted the wife of a black citizen with the announced purpose of having sexual relations with her. A jury of reasonable persons could believe this story, whether we would or not.

The Right-to-Counsel Question

The recent decisions of the Supreme Court of the United States in Kirby v. Illinois [8] and United States v. Ash [9] resolve the Sixth Amendment question, although they complicate the Due Process question.
Kirby held that the right to counsel attaches “Only at or after the time that adversary judicial proceedings have been initiated,” [10] and Bryan was displayed before any accusation of murder was made. This is the result of Perkins v. State,[11] in which our Florida Supreme Court had similarly read Wade restrictively. Since a pre-accusation line-up is not a “critical stage” of the prosecution, we dismiss Bryan’s contention on this point on high authority, but with mixed personal feelings.
More recently in United States v. Ash, supra, the Supreme Court of the United States has reversed a decision of the Court of Appeal for the D.C. Circuit which held that the Sixth Amendment required counsel present at a post-indictment photographic display. Ash pretty well disposes of Bryan’s claim under the Sixth Amendment to an absolute right to counsel at the photographic display in the room upstairs at the Hillsborough County Jail. However, it is important to note that Ash left open for determination by the trial court the Due Process question and that in Kirby the Due Process question had been consid *520 ered by the trial court and resolved against Kirby in the light of the ample opportunity which the victim had to observe Kirby during the crime and other factors evidencing compliance with due process.
Even in Wade, the majority knew that our system makes it impractical to use con-sel not to counsel, but to witness. What is needed at line-up is some assurance of fairness, and, if we are to allow maximum play for the adversary system to function in lieu of rigid constitutional proscriptions, we must acknowledge the suspect’s interest in being able to recognize flaws in the process. He may then either persuade the police to conduct the procedure fairly,_ or gain the evidence necessary to support a claim of denial of due process or to ground an effective cross-examination, depending on the nature of the particular claimed infirmity.
The British system would afford a suspect the right to have a solicitor — who need not worry about having to be both advocate and witness in court- — or even a lay friend witness the line-up.[12] Uviller criticizes the Wade ruling on the ground that it “demeans the role of defense counsel,” making of the lawyer a witness to an event.[13] Wade required counsel as a solution to a problem to which counsel is not the appropriate solution. This leads us to a consideration of the remaining constitutional question, a more difficult one to analyze because it involves not a simple grant or denial of the right to a lawyer during a critical stage of a prosecution, but a consideration of the “totality of circumstances.”
Kirby and Ash indicate the Supreme Court’s withdrawal from a mechanically applied rule but they show no retrenchment whatever from the fundamental premise that there is danger in the process of identification which necessitates a respect for due process.

The Due Process Question

The discussion of the identification procedures states fairly completely what we must consider as the State's initial contribution to what Mr. Justice Harlan referred to as the “totality of circumstances,” [14] and determine whether there was “impermissible” suggestion.[15]
I oversimplify, but what we have here is, in essence, a group of three witnesses who are shown, in fairly rapid succession, Bryan and “A” Group, photographically, Bryan and “B” Group, photos, Bryan and “C” Group, physically, in the presence of counsel, then, upstairs, in the absence of counsel, Bryan and probably “B” Group photos.
Consider now Foster v. California.[16] Foster is the first case in which the Supreme Court invalidated a conviction on due process grounds stemming from a faulty identification. Foster was shown in a line-up with only two others. He was the only tall man. He wore a leather jacket like the robber’s. The witness could not positively identify him. Foster was brought face-to-face with the witness across a table and asked to speak. The witness was not sure. A week or 10 days later Foster was again displayed in a lineup, with four others, none of whom had appeared in the first line-up. The procedure was held to be impermissibly suggestive.
Compare Simmons v. United States.[17] An employee of a robbed bank described *521 the getaway car as a Thunderbird with a large scrape on the right side. A car matching this specific description was located within an hour. It belonged to Simmons’ sister-in-law, who told police she had loaned it to Andrews, her brother. At the home of Andrews’ mother items from the bank were found. The next day, FBI agents obtained pictures of Andrews and Simmons, said by his sister-in-law to have been with Andrews, which showed them together with other persons who just happened to be in the photographs. Thus far this much is established: the criminals were at large. Sound detective work focused on Simmons, among others, and the only photographs obtained were personal ones, picturing a number of individuals, especially the suspects, but they were the best available. Each of the five bank employees who witnessed the robbery were separately shown the photographs. Each identified Simmons. The Supreme Court held that the circumstances justified the use of the photographs, that each case must be considered on its own facts, and that “convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.” [18]
Between Foster and Simmons the most striking contrast is in the attitude of the police toward the suspect. In Simmons, the officers investigated the case vigorously, and made full use of the photographs, but did so fairly and with no more sugges-tivity than the circumstances required. In Foster, fairer procedures were possible.
In Bryan’s case, the initial interview with the city police developed the difference in conduct between the two men, and suggested to any sensitive police officer the possibility of a defense which would divorce one of the two men from the other’s aggressive conduct. Although the suggestive procedures at the County jail were conducted by Sheriff’s deputies, they cannot have been unaware of information gathered by Tampa police in the matter.
No necessity for showing Bryan photographically rather than physically existed, except possibly at the first showing. This is not per se objectionable, but it is a factor to be considered. In England, for example, the showing of photographs of a prisoner in custody instead of holding a properly structured corporeal line-up would result in the quashing of the conviction.[19] And it is difficult to believe that only two blond men were in the Hillsborough County jail at the time of the line-up. There is, in any event, no effort at justification. The complaint of Bryan’s counsel was met by pointing out one other man who was blond, not by any justification on the basis of necessity, nor by any effort at involvement of counsel in the process of structuring a non-prejudicial line-up. One aspect of Bryan’s appearance about which the witnesses commented was a “bushy” hairdo. This the State’s officers destroyed, leaving Bryan looking like a Marine recruit, and very different from the photographs taken of him at booking. No effort to have any man at the line-up speak was made, though Wade, the case which the officer in charge remembered as requiring counsel at line-up and as suggesting photographic displays as a way to avoid the presence of counsel, permitted compulsory speaking of words used by the criminals.
No effort to produce Durham was made. These displays were made in June, and Durham was located in Kentucky in July. Van Winkle, with whom Durham and Bryan were staying, was with the officer who went to Kentucky to interview Durham. This officer did not interview any *522 of the other persons in that home that night before proposing to the State Attorney then in office that Durham be given immunity. Van Winkle’s wife knew that Durham’s cousin, present in the party earlier on the night of the crime, had taken newspaper clippings about Mrs. Brooks’ murder to Durham. Coleman, another witness, testified that Durham had told him that he (Durham) had cut a woman’s throat.[20]
In my view, the totality of circumstances includes the effect of police conduct. An analysis of cases in which faulty procedures have been followed but in which convictions have been affirmed will reveal that many of these ought properly to be grounded on the harmless error doctrine. It is difficult to formulate a rule for guidance of trial courts and for police officers as to how much suggestiveness is “permissible.” Sound practice dictates that police officers should formulate procedures which eliminate suggestiveness to the extent reasonably possible, and which may be reconstructed during discovery and at trial. In this case there is no mention of any written procedure. Some of the practices followed are rooted in common sense and appear to have been followed habitually. For example, the witnesses were apparently properly segregated from each other and interviewed separately.
In this case the identification of Bryan as the culprit was virtually dictated by repeated showing of his image to the witnesses and by studied avoidance of showing Durham. That the procedures did in fact confuse the witnesses is shown by a comparison of their statements to City Detective Stamatakis the day following the crime — the statements to officers within hours afterward were not allowed to be produced — and their depositions, on the one hand, and their testimony at trial, on the other, and by the fact that attributes which Durham admits to be true of him were attributed by the witnesses to Bryan.
The commands of the Due Process clause would seem to require to the extent practicable procedures designed to ascertain truth and to afford full right of cross-examination. This case exhibits failure in both respects.
Students of the law of eyewitness identifications will wonder whether there was in this case a possibility that the identifications were grounded on a base independent of the tainted evidence. There is no effort to comply with the procedure suggested in Wade for the rehabilitation of identification witnesses, principally because there is no recognition of the taint.

The Law of Evidence

It is beyond dispute that the concept of Due Process has been enlarged by Foster and other decisions. We have already noted how the Sixth Amendment claims based on pre-trial identification procedures have shrunk in significance since Kirby and Ash. This means that due process claims must be more seriously considered. There remains another factor conducing to the enlargement of the due process realm, which I note not because it is raised, but because it shows why the procedures followed here violate due process.
It was widely argued before Wade-Gilbert-Stovall that faults in police identification practices went to the weight, but not the admissibility, of evidence. A brief review of trends in the law of evidence is necessary to show that this distinction is alive and needs to be understood.
Analytically, much evidence of a pretrial identification may be objectionable under the hearsay rule. Wigmore says that the act of pointing out the accused in the courtroom “is of little testimonial force.” [21] He goes on to point out that the *523 psychology of the situation is the same as when recent contrivance is alleged, and that “it is entirely proper ... to prove that at a former time, when the suggestions of others could not have intervened to create a fancied recognition in the witness’ mind, he recognized and declared the present accused to be the person. If, moreover (as sometimes is done) the person was then so placed among others that all probability of suggestion . is still further removed, the evidence becomes stronger.”[22] Wigmore says much more that police and prosecutors could read with profit. His general thesis is that the best evidence of identity is that established when memory of the crime is fresh, but he makes it clear that suggestiveness must be eliminated. He argues for caution, and “in particular for an overhauling of the methods used by police officials in confronting the accused with the victim.”[23]
Florida law is moving in the direction of freer admissibility. Contrast Martin v. State, 1930, 100 Fla. 16, 129 So. 112, with Willis v. State, Fla.App.1st 1968, 208 So.2d 458. In Willis, Judge Wigginton traces the trend away from technical hearsay obj ectionability, which emphasizes the need for police procedures insuring reliability. Following this sound opinion, the Supreme Court adopted Judge Wigginton’s view. Willis v. State, Fla.1968, 217 So.2d 106.
A variety of problems can arise as a result of traditional hearsay analysis of evidence of prior identification. Suppose, for example, that the witness at trial cannot identify the accused. Should it not be permissible to show that on a former occasion, adequately safeguarded, an identification was effected?[24] If this be so, why is it not appropriate to allow the suspect to have his attorney or a witness or preferably attorney and a witness present whose testimony might be adduced, if necessary, to rebut the force of the testimony by pointing out factors tending toward suggestion or misidentification ?
Where the law is tending is toward the freshest, most completely open and safeguarded procedures for avoiding improper suggestion. And courts should recognize the testimonial value of such evidence. It is far better than a ritual identification at trial. Too, there are circumstances in which the trial judge may allow the accused to sit among others in the courtroom in order to avoid the suggestion inherent in his position at the counsel table. While this is not the common practice, it is by no means objectionable, and in a proper case ought to be considered as a safeguard against a reflexive identification of the person who may obviously be the only accused person in the courtroom.
The question arises whether police officers should be allowed to testify as to identification in the absence of the witness’ failure to recount the prior identification. The present practice seems to be to elicit such testimony, although it is cumulative. It was allowed here without objection. Yet the officers persistently made the testimony stronger than did the witnesses themselves. For example, the prosecutor would elicit from the witness that he identified Bryan as one of the two white men present that night. Testifying to the same witness’ identification of Bryan, a deputy testified that the witness identified Bryan, and went on to say “He was aggressive.” The witness present at the scene of the abduction of Mrs. Brooks had never used the word aggressive or indicated that he had it within his vocabulary. This is hearsay, and unless shown to be competent would be excluded upon objection.
But our inquiry now is into the theory of prior identification. Our conclusion is that upon failure of direct testimony, the *524 testimony of police witnesses present at the identification should be allowed, if the proper predicate is laid. What constitutes such a showing? We submit that this is the point at which the emerging theory of evidence demands more intensive examination of identification procedures and routine involvement of the accused’s counsel in them.
Again, we emphasize the importance of circumstance. In Simmons, for example, the officers worked on strong leads, but had no man in custody, much less any means of identifying who his lawyer might be. But in Foster, a telephone call to the suspect’s lawyer might have salvaged what proved to be a defective identification.
As the rules of evidence are made to conform with the common sense of the situation, so must the procedures employed to effect identification. We strongly recommend the study of this problem in depth by law enforcement officials from the Attorney General down, and the development of procedures analogous to the Home Office letters which govern conduct of English police procedures.[25] The consequence must inevitably be better detection, more persuasive proof and, hopefully, fewer or at least more readily determinable appeals.

Suppression of Evidence Favorable to the Defense

Bryan’s request for an in camera inspection at trial of statements made by the witnesses was met by the prosecutor’s claim that they were consistent with the witnesses’ depositions. If this is so, they were inconsistent with some of the testimony at trial on crucial questions going to the separation of Bryan from Durham — indeed, Bryan’s only defense. These statements were, then, by the State’s admission, of use for purposes of impeachment. The question is not whether the witnesses had at any time made inconsistent statements. That is demonstrated by their depositions taken at Bryan’s instance. If on several occasions they supported Bryan’s theory and stated under oath particulars about the identity of the two men involved which buttress Bryan’s defense, he was entitled to this evidence for reasons lucidly explained by Judge McNulty in State v. Gillespie.[26]
In addition, the statements given to Tampa police were highly material to Bryan’s defense. The witnesses all testified that at the time their descriptions were good ones. The trial judge refused even an in camera look, persuaded after his sound intuition had caused him to ask to see them by the importunity of the state attorney. These statements should have been made available.

Conviction on a Lesser Offense

Our law provides for the affirmance of conviction of a lesser charge clearly shown by the record in the event the proof of the greater is found defective. I think Fla. Stat. § 924.34, F.S.A. (1971) should be interpreted to allow the State either to retry Bryan on the murder charge or to elect the entry of judgment of conviction as an accessory after the fact.
Bryan’s own testimony is to the effect that Durham took him to the scene of the murder, showed him the body and tried to get Bryan to help him bury Mrs. Brooks. Bryan helped Durham wash the blood out of his car. Clearly he is an accessory to the murder, and punishable under Fla. Stat. § 776.011, F.S.A. (1971).
A casual perusal of the annotations following the text of this section in 776.011, F.S.A. might suggest that the conviction of the principal is a prerequisite to conviction of the accessory. This is not the law. The law is that the guilt of the principal must be shown, as an element of the acces *525 sory’s offense. But it is not necessary that the principal be charged — as Durham was not in this case — in order to convict the accessory.[27]
I respectfully dissent.

. Palmer v. Peyton, 4th Cir. 1966, 359 F.2d 199.

. 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

. 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.EM. 2d 1149.

. 9 U.L.A. 86 et seq.; Fla.Stat. §§ 942.01-942.06 F.S.A.; Ky.Rev.Stat. 421.230-421.-270.

. State v. Roby, Fla.1971, 246 So.2d 566.

. Roby v. State, Fla.App.2d 1969, 229 So.2d 604.

. Fla.1950, 49 So.2d 332. Chapman v. Calif., 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, arrives at the same principle.

. 1972, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed. 2d 411.

. 1973, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed. 2d 619.

. 406 U.S. at 688, 92 S.Ct. at 1881.

. Fla.1969, 228 So.2d 382.

. Williams, Identification Parades, 1955 Crim.L.Rev. 525, 528.

. The Role of the Defense Lawyer at a Lineup in Light of the Wade, Gilbert, and Stovall Decisions, 1968, 4 Crim.L.Bull. 273, 285.

. Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247.

. Id. at 384, 88 S.Ct. 967.

. 1969, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402.

. 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed. 2d 1247.

. Id. at 384, of 390 U.S. at 971 of 88 S.Ct.

. Rex v. Goss, 17 Cr.App.R. 196 (Eng.1923); Rex v. Haslam, 19 Cr.App.R. 59 (Eng. 1925); Rex v. Chapman, 7 Cr.App.R. 53 (Eng.1911); Rex v. Lee, 1 Cr.App.R. 5 (Ehg.1908); cf. Rex v. Melany, 18 Cr.App.R. 2 (Eng.1924).

. One flare-up at trial was produced when the prosecutor insistently asked Coleman whether Durham could not have said “we” cut the woman’s throat.

. 4 Wigmore, Evidence § 1130.

. Id.

. Id.

. United States v. De Sisto, 2 Cir., 329 F.2d 929. For an informative opinion on the admissibility of normally objectionable hearsay. See United States v. Barbati, E.D.N.Y.1968, 284 F.Supp. 409.

. Williams, supra, n. 12, at 526.

. Ma.App.2d 1969, 227 So.2d 550; see also State v. Drayton, Ma.App.2d 1969, 226 So.2d 469; State v. Williams, Fla.App.2d 1969, 227 So.2d 253; Brady v. Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

. United States v. Barfield, 5th Cir. 1971, 447 F.2d 85; State v. Peel, Fla.App.2d 1959, 111 So.2d 728; Feldstein v. United States, 9th Cir. 1970, 429 F.2d 1092, 1095.